IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CERTIFIED LABORATORIES, a division of NCH CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:22-mc-60-K-BN |
| | § | |
| MOMAR, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OF LAW IN SUPPORT OF MOMAR, INC.'S OBJECTION TO FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF THE UNITED STATES MAGISTRATE JUDGE**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................2

I. Factual Background ....................................................................................2

II. Procedural History ....................................................................................5

ARGUMENT AND CITATIONS TO AUTHORITY ..............................................9

I. Legal Standard for Report and Recommendation .........................................9

II. Lack of Subject Matter Jurisdiction .............................................................9

A. Subject Matter Jurisdiction Related to Arbitration Subpoena Enforcement ....................................................................9

B. The Value of Documents Momar Previously Provided are Not "in Controversy;" NCH Already Possesses Them ..........................10

C. NCH Fails to Establish the Amount in Controversy Required for Subject Matter Jurisdiction...................................................12

CONCLUSION....................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Health Mgmt., LLC v. Benchmark Health Network, LLC*,
No. 3:20-CV-00443-X, 2020 WL 980250 (N.D. Tex. Feb. 28, 2020) ....3, 9, 10

*In re Anderson*,
No. 4:13-CV-322-A, 2013 WL 3871104 (N.D. Tex. July 25, 2013)....11

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006)....9

*Broumand v. Joseph*,
522 F. Supp. 3d 8 (S.D.N.Y. 2021) ....1

*Empire Fin. Grp., Inc. v. Penson Fin. Svcs., Inc.*,
No. CIV.A. 3:09-CV-2155D, 2010 WL 742579 (S.D. Tex. Mar. 3, 2010)....3

*Harrison v. XTO Energy, Inc.*,
705 F. Supp. 2d 572 (N.D. Tex. 2010) ....11

*Larabee v. U.S. Bank, N.A.*,
No. 4:13-CV-418-A, 2013 WL 4077038 (N.D. Tex. Aug. 9, 2013) ....11

*Leininger v. Leininger*,
705 F.2d 727 (5th Cir. 1983) ....10

*Longmire v. Guste*,
921 F.2d 620 (5th Cir. 1991) ....9

*Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*,
939 F.3d 1145 (11th Cir. 2019) ....1

*Middle S. Energy, Inc. v. City of New Orleans*,
800 F.2d 488 (5th Cir. 1986) ....11

*Orix Credit Alliance, Inc. v. Wolfe*,
212 F.3d 891 (5th Cir. 2000) ....11

*SEC v. Med. Comm. for Human Rights*,
404 U.S. 403 (1972)....11

*Shields v. Norton*,
289 F.3d 832 (5th Cir. 2002) ....11

*Sims v. A T & T Corp.*,
No. CIV.A. 3:04-CV-1972-D, 2004 WL 2964983 (N.D. Tex. Dec. 22, 2004) ....................... 11

*St. Paul Reinsurance Co. v. Greenberg*,
134 F.3d 1250 (5th Cir. 1998) ....................................................................................... 12

*Zurich Ins. PLC v. Ethos Energy (USA) LLC*,
No. 4:15-CV-03580, 2016 WL 4363399 (S.D. Tex. Aug. 16, 2016) ................................... 3, 9

**Statutes**

28 U.S.C. § 636(b)(1)(C) .............................................................................................. 9

28 U.S.C. § 1332 ............................................................................................... 2, 9, 10

**Other Authorities**

FED. R. CIV. P. 45 .......................................................................................................... 1

FED. R. CIV. P. 72(b) ..................................................................................................... 1, 9

N.D. Tex. L.R. 72.2 ........................................................................................................ 1

COMES NOW, Momar, Inc. ("Momar"), by and through undersigned counsel and pursuant to Local Rule 72.2, and hereby submits its Objection to the Findings, Conclusions, and Recommendations of the United States Magistrate Judge, respectfully showing this Honorable Court the following.

## INTRODUCTION

Certified Laboratories, a division of NCH Corporation ("NCH"), commenced an arbitration more than a year ago against its former employee, Matthew Phillips, alleging that Phillips violated certain restrictive covenants contained in his employment agreement with NCH. After more than a year of activity, the arbitration proceedings against Mr. Phillips are scheduled to occur in September 2022 (the "September Hearing").

Meanwhile, frustrated that it has been unable to obtain documents to which it is not legally entitled from Momar, an out-of-state, non-party in the arbitration, NCH moved this Court to enforce an arbitral subpoena seeking testimony and documents from Momar at the September Hearing. The Magistrate Judge's Recommendation properly concluded that the Application to Enforce Arbitration Subpoena should be denied (Doc. 10).

Momar agrees with the overall Findings, Conclusions, and Recommendation ("Report") of the United States Magistrate Judge (Doc. 10). In particular, the Magistrate Judge properly concluded that NCH's subpoena seeking testimony and documents at the hearing was unenforceable under Section 7 of the Federal Arbitration Act and Rule 45 of the Federal Rules of Civil Procedure. *See id.* at 12-17 (discussing, *inter alia*, *Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1160 (11th Cir. 2019) and *Broumand v. Joseph*, 522 F. Supp. 3d 8, 17 (S.D.N.Y. 2021)). Consistent with Rule 72(b)(2) and Local Rule 72.2, Momar will

be separately submitting its response to NCH's Objections (Doc. 13) on this issue on or before September 9, 2022.

Meanwhile, Momar respectfully submits this objection to the Magistrate Judge's Report, on the grounds that NCH's Application to Enforce Arbitration Subpoena may also properly be denied for lack of subject matter jurisdiction. This provides a separate and independent basis for denying NCH's Application. Specifically, other than rank speculation, NCH has failed to demonstrate that the subpoenas satisfy the amount in controversy requirement of 28 U.S.C. § 1332. Because the amount in controversy requirement of diversity jurisdiction is paramount to federal jurisdiction, Momar respectfully submits that subject matter jurisdiction is lacking in this case, and that denial of the Application is additionally warranted on these grounds.

## BACKGROUND

Although not all of the underlying facts are directly pertinent to the Magistrate Judge's Report, they provide helpful context in understanding this dispute and the basis for NCH's current Application to Enforce Arbitration Subpoenas.

NCH initiated an arbitration proceeding against Matthew S. Phillips on May 21, 2021 ("Arbitration"). (Doc. 1 at 9). NCH alleged that Mr. Phillips violated certain restrictive covenants in his employment agreement by making sales to his former customers after accepting employment with Momar. (*Id.*).

### I. Factual Background

On or around September 16, 2021, the arbitrator entered an Order enjoining Mr. Phillips from soliciting or making any further sales to customers that he serviced while he was at NCH (the "Injunction"). (*Id.*). Once Momar became aware of the Injunction, it took immediate steps to ensure that Mr. Phillips was barred from making any further sales to customers that he used to

service while at NCH. (D-APPX-0001 at ¶¶ 6, 8[1]; D-APPX-0003 at ¶ 9[2]). Mr. Phillips has complied with the Injunction since it was issued. (D-APPX-003 at ¶ 7). Importantly, NCH never (1) asserted a claim against Momar in the Arbitration; (2) instituted a separate action against Momar; or (3) otherwise asserted a substantive cause of action against Momar. The Arbitration proceeded against Mr. Phillips for much of 2021 with no participation from Momar. (*See* D-APPX-0005 at ¶ 4[3]).

Although omitted from NCH's accounting of the facts at issue, in or around March 2022, Momar received a subpoena via email from NCH, requesting documents reflecting revenue figures and products sold to fifty-nine (59) identified customers that Mr. Phillips supposedly serviced while with NCH (the "First Subpoena"). (*See* D-APPX-0007 – 0015[4]; D-APPX-00016-0017)[5]). NCH additionally requested information concerning Mr. Phillips's compensation by Momar. (*Id.*). All of this information could have been requested directly from Mr. Phillips. (*See id.*; Doc. 1 at 10). In fact, at the time NCH sent the First Subpoena to Momar, Mr. Phillips had *already produced* to NCH invoices for forty-one (41) of the fifty-nine (59) customers identified in the First Subpoena. (*See* D-APPX-0016-0017). Additionally, Mr. Phillips had *already produced* his employment agreement with Momar—which summarized Mr. Phillips's compensation. (*See id.*).

Momar's counsel advised NCH that Momar had no legal obligation to comply with this First Subpoena in light of Momar's status as a non-party to the Arbitration. (*Id.*).[6] Nevertheless,

---

[1] The Declaration of Julian B. Mohr is made part of the Appendix at Exhibit A. *See* D-APPX-0001 – 0002.
[2] The Declaration of Matthew Phillips is made part of the Appendix at Exhibit B. *See* D-APPX-0003 – 0004.
[3] The Declaration of John M. Moye is made part of the Appendix at Exhibit C. *See* D-APPX-0005 – 0006.
[4] The March 25, 2022 Subpoena to the corporate representative for Momar, Inc., with confidential customer information redacted, is made part of the Appendix at Exhibit D. *See* D-APPX-0007 – 0015.
[5] A true and correct copy of the e-mail from John Moye, dated March 31, 2022, is made part of the Appendix at Exhibit E. *See* D-APPX-0016 - 0017.
[6] *See Aetna Health Mgmt., LLC v. Benchmark Health Network, LLC,* No. 3:20-CV-00443-X, 2020 WL 980250, at *1 (N.D. Tex. Feb. 28, 2020) (non-party not obligated under the FAA to provide pre-hearing discovery); *accord Empire Fin. Grp., Inc. v. Penson Fin. Svcs., Inc.*, No. CIV.A. 3:09-CV-2155D, 2010 WL 742579, at *1 (S.D. Tex. Mar. 3,

in an attempt to cooperate, Momar agreed to provide additional information to NCH. (D-APPX-0005 at ¶ 6; *see also* D-APPX-0016 - 0017). In doing so, Momar reviewed its records and confirmed that Mr. Phillips never made a sale to an additional eleven (11) of the remaining eighteen (18) customers NCH identified. (D-APPX-0018[7]). As to the remaining seven (7) customers on NCH's list, Momar confirmed that Mr. Phillips made sales to only three (3) of those additional customers. Momar provided NCH with invoices for those customers. (*Id.*)

Contrary to NCH's assertions, at no point did Momar consent to or agree to be subject to the jurisdiction of the Arbitration. (D-APPX-0005 at ¶¶ 7, 8). In fact, Momar made clear that it was not consenting to the jurisdiction of the Arbitration. (*Id.*)

Mr. Phillips was deposed in January 2022. In the wake of Mr. Phillips's deposition, and without any testimony actually supporting the allegation, NCH asserted that Momar had been engaging in what NCH describes as customer "swapping." (*See* Doc. 1 at 9).

NCH incorrectly asserts, without support, that Mr. Phillips ceased communication with his former NCH customers after the Injunction issued, but then referred the customers to other Momar employees to make the sales, specifically Donna Ray. (Doc. 1 at 11 (without citation to evidence)). Based on this unsupported "suspicion," which is not corroborated by any actual facts, NCH e-mailed Momar a follow-up list, this time of fifty-seven (57) customers, asking Momar to confirm whether Mr. Phillips had made sales to those customers. (*See* D-APPX-0021[8]).

Out of the "new" list of fifty-seven (57) customers, Momar found one (1) additional customer who had purchased from Mr. Phillips *prior* to the Injunction. (*See* D-APPX-0021).

---

2010); *Zurich Ins. PLC v. Ethos Energy (USA) LLC*, No. 4:15-CV-03580, 2016 WL 4363399, at *1 (S.D. Tex. Aug. 16, 2016).

[7] A true and correct copy of the e-mail from John Moye, dated April 12, 2022, with confidential customer information redacted, is made a part of the Appendix at Exhibit F. *See* D-APPX-0018 - 0020.

[8] A true and correct copy of the e-mail from John Moye, dated May 9, 2022, with confidential customer information redacted, is made a part of the Appendix at Exhibit G. *See* D-APPX-0021 - 0026.

Momar produced the sales records for that customer. (*Id.*) Momar further advised NCH that it now possessed *all sales information* related to transactions involving Mr. Phillips, as an employee of Momar, to NCH customers. *Id.* ("To be clear, between Phillips's production, Momar's production in response to the [First] subpoena, and this supplemental set of invoices, you should have invoices for all NCH customers that Phillips has sold to since joining Momar.").

Momar's voluntary production should have been the end of the story, but NCH remained determined to pursue unnecessary and irrelevant discovery to which it is not entitled.

## II. Procedural History

In May 2022, NCH sent Momar two new subpoenas, requiring Momar to produce Atlanta-based Momar employee Donna Ray[9] to testify at the Arbitration hearing, which was then scheduled for May 24, 2022. (*See* Doc. 1 at 11). NCH also sought to have Momar produce a second corporate representative to testify and provide documents at the hearing reflecting *Momar's*—not Mr. Phillips's—sales to a list of 178 total customers (the "Second Subpoena," [Doc. 1-1] and with the First Subpoena [D-APPX-0007 – 0015], the "Subpoenas"). .

NCH moved within the Arbitration for an Order requiring Momar to comply with these new subpoenas. (*See* Doc. 1 at 11). Without consenting to jurisdiction, Momar specially appeared before the Arbitrator to oppose NCH's motion. (*See id.*). Ultimately, the Arbitrator granted in part and denied in part NCH's Motion. (*See* Doc. 1-5 ("[T]he Arbitrator limits the sole duces tecum Request in the Subpoena to exclude documents related to sales to customers where Momar had a preexisting relationship with the customer for products similar to those sold by Phillips.")).

[9] Donna Ray is the sixty-eight year old former Chief Operations Officer of Momar. She retired in February 2022 after decades of service to the company. Like Momar, Ms. Ray is a non-party to the Arbitration. Perhaps understanding the unlikelihood that Ms. Ray would testify in a way that benefitted NCH in the hearing, on May 18, 2022, NCH informed Momar it was withdrawing the subpoena directed to her. Nevertheless, NCH stated it was proceeding with the subpoena against another Momar corporate representative, even though the Momar and Ms. Ray subpoenas are founded on the same groundless theory.

NCH amended the Second Subpoena to appear and testify at the hearing and for documents, and again sent it to Momar dated July 6, 2022. (Doc. 1-2). Although the Arbitrator instructed NCH to narrow the scope of the Second Subpoena in accordance with the above language, NCH did not do so. (*See id.*). Instead, NCH only narrowed the Second Subpoena to exclude documents related to sales to customers where Momar had a preexisting relationship with the customer for the period of eighteen (18) months before Mr. Phillips joined Momar. (*Id.*).

The premise for the Subpoenas and this action to enforce the Subpoenas can be boiled down to a tortured interpretation of Mr. Phillips's deposition testimony[10]. Specifically, during the deposition, NCH showed Mr. Phillips a handful of text messages from his former NCH customers, post-dating the injunction, in which Mr. Phillips advised the customers to contact Donna Ray at Momar:

> Q: I got it. So customers called – contacted you, you – you gave her the contact of someone else to speak with at Momar; is that –
>
> A: So since the injunction I have been completely out of talking with any customers, going to their sites, answering their calls, visiting with them in any form or capacity. I've been working out of the state to comply above and beyond with this agreement even though we don't agree with it. We're still trying to, you know, do what's right. And I've been staying completely out of the territory.
>
> And so in that case there, I avoided Drew multiple times. He called me, texted me. **And I was finally advised that in the case where customers called, that I would not discuss any business with them whatsoever. I would immediately inform them that, you know, unfortunately, I'm not able to talk to you about any business at this time**. But if you have, you know, anything that you need to discuss, you can contact Donna Ray at (404) 355-4580. **Donna and I have not spoken. I don't know – have any idea who's contacted her, who's been successful contacting her. I don't know anything beyond that**.

(D-APPX-0028 at 147:11–148:8) (emphasis added).

A second exchange occurred along these same lines:

[10] Excerpts from the January 5, 2022 Deposition of Matthew Phillips, with confidential customer information redacted, are made a part of the Appendix at Exhibit H. *See* D-APPX-0027 - 0029.

> Q: So will you explain – were you on the phone with him and then provided that number?
>
> A: Yeah. So what I was in the process of explaining – this order was placed and we could only fulfill part of it. We were – I don't remember if something got messed up in transit or what, but part of the order shipped. And before we could get the other out, this was when we got this order. And so he was calling me asking where the rest of the stuff was that he had purchased prior to the injunction. And that's when I sent him a text and just said, I'll – you know, call Donna. **<u>She can explain anything to you because I can't talk to you</u>.**
>
> **Q: <u>Have you told any customer that Donna could continue to sell – sell to them</u>?**
>
> **A: No. <u>I'm not aware of any conversations like that. I just told them that they can contact Donna. I don't – I don't recall ever telling a customer that</u>.**

(D-APPX-0029 at 151:7–24) (emphasis added). *See also* D-APPX-0028 at 148:9-12 (Q: Do you still get paid on sales that Donna's making on those customers? A: <u>I don't know that Donna's making sales on those customers</u>.").

The testimony and other evidence shows that, after Mr. Phillips was enjoined, he was told by Momar to tell customers that they should contact Momar's Chief Operating Officer because he could not talk to them. (*See* D-APPX-0027 - 0029, *supra*; *see also* D-APPX-0003 at ¶ 8). NCH has provided no evidence of *what* Ms. Ray told customers who called asking for an "explanation" of Mr. Phillips's legal status—and certainly no evidence that any of Phillips's customers were "swapped" to a different representative. (*See generally* Doc. 1).

Rather, the testimony makes clear that Mr. Phillips has no knowledge of whether any sales were made by Momar to NCH customers after the date of the injunction. Indeed, his testimony is that, other than telling customers to contact Ms. Ray, Mr. Phillips has no idea what happened to the customers after that point in time (including whether the customer actually contacted Ms. Ray). (*See* D-APPX-0027 - 0029, *supra*). At most, the foregoing evidence demonstrates that Mr. Phillips

directed customers to Ms. Ray for assistance with past sales, but provides no indication that Mr. Phillips asked or instructed that Ms. Ray make future sales.

NCH, however, has stubbornly persisted in its erroneous belief that Phillips "swapped" customers to a different Momar representative, and has pursued a fishing expedition against Momar—an out-of-state non-party—based on that unsupported belief.

Momar informed NCH that Donna Ray was not a sales representative, she did not make sales to customers, and she never engaged in the client "swapping" NCH has imagined—based solely on uncorroborated "rumors" it supposedly received regarding Momar's sales activities. (D-APPX-0030)[11]; D-APPX-0037)[12].) Notably, NCH has not made any effort to substantiate what those rumors were and where the rumors originated. (*See* D-APPX-30; D-APPX-0045[13])). As counsel has repeatedly advised NCH, after the injunction issued, Momar prohibited Mr. Phillips from dealing with any customers he serviced at NCH and blocked him from processing transactions involving any of his former customers. (D-APPX-0001 at ¶ 8). When his former customers had an issue with a past sale, and attempted to contact Mr. Phillips to resolve those issues, Mr. Phillips was told to direct them to Ms. Ray so she could inform them Mr. Phillips could not communicate with them at the current time. Mr. Phillips stated and repeated this fact in his deposition, continues to repeat this fact to this day (*See* D-APPX-0003 at ¶ 8), and counsel for Momar has reiterated this point to NCH on multiple occasions.

Mr. Phillips also plainly testified that he has no knowledge about what happened after the customers spoke to Ms. Ray, and that he and Ms. Ray never discussed what happened. Ms. Ray's

[11] A true and correct copy of the e-mail from Dave Wishnew, dated May 9, 2022, with confidential customer information redacted, is made a part of the Appendix at Exhibit I. *See* D-APPX-0030 - 0036.

[12] A true and correct copy of the e-mail from John Moye, dated May 11, 2022, with confidential customer information redacted, is made a part of the Appendix at Exhibit J. *See* D-APPX-0037 - 0044.

[13] A true and correct copy of the e-mail from Dave Wishnew, dated May 11, 2022, with confidential customer information redacted, is made a part of the Appendix at Exhibit K. *See* D-APPX-0045 - 0053.

job, one that she performed well before her retirement, was to prevent a violation of the injunction, not to encourage it. (*See* D-APPX-0037; D-APPX-0001 at ¶ 8). It is telling that the only response NCH has to this point is its flagrant speculation that "Momar continued to sell to NCH's customers, using Phillips as a 'gatekeeper' who would refer the customer to Ray, Momar's employee, for the purposes of coordinating additional sales." (Doc. 1 at 13–14). NCH offers no support for this assertion and otherwise provides no reason to accept it other than NCH's own unsupported and uncorroborated belief.

## ARGUMENT AND CITATIONS TO AUTHORITY

### I. Legal Standard for Report and Recommendation

Findings, Conclusions, and Recommendation of a United States Magistrate Judge are subject to *de novo* review. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(3); *Longmire v. Guste*, 921 F.2d 620, 623 (5th Cir. 1991).

### II. Lack of Subject Matter Jurisdiction

Federal courts have "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Diversity subject-matter jurisdiction mandates complete diversity between the parties and an amount in controversy exceeding $75,000. 28 U.S.C. § 1332.

#### A. Subject Matter Jurisdiction Related to Arbitration Subpoena Enforcement

The Magistrate Judge correctly concluded that it is inappropriate to look to the amount in controversy in the underlying arbitration to determine the amount in controversy in an action to enforce arbitration subpoenas, because the subpoena enforcement action represents a separate proceeding between different parties. *Aetna Health Mgmt., LLC v. Benchmark Health Network, LLC*, No. 3:20-CV-00443-X, 2020 WL 980250, at *3 (N.D. Tex. Feb. 28, 2020); *Zurich Ins. PLC*

*v. Ethos Energy (USA) LLC*, No. 4:15-CV-03580, 2016 WL 4363399, at *3 (S.D. Tex. Aug. 16, 2016) (The controversy before the Court does not form the basis of the arbitration . . . . [Proponent] asserts no claim against [the arbitration subpoena enforcement defendant], and seeks nothing from [the arbitration subpoena enforcement defendant] other than the production of discovery documents.").

As set forth in *Aetna*, it is highly doubtful that a party can establish the amount in controversy requirement in seeking to enforce an arbitration subpoena when the only relief sought is "appearance before the arbitrator, the production of discovery documents, costs and fees for its non-appearance at a previous arbitration hearing, and an order to hold the [subpoenaed party] in contempt." *Aetna*, 2020 WL 980250, at *3. Of course, the *Aetna* case precisely describes the facts present here and, based on *Aetna*, NCH's Application case fails to satisfy the amount in controversy requirement for subject matter jurisdiction. Yet even if *Aetna* did not apply to these facts, and NCH was permitted to satisfy the amount in controversy requirement solely based on enforcement of the subpoenas to demand appearance, documents, costs and fees, and contempt, it has failed to do so here.

B. <u>The Value of Documents Momar Previously Provided are Not "in Controversy"; NCH Already Possesses Them.</u>

In the Report, the Magistrate Judge supported the conclusion that NCH satisfied the amount in controversy based upon the $341,406.85 in sales that **Mr. Phillips** made while working for Momar, all **before the Injunction**. (Doc. 10 at 8). This conclusion was in error.

"The district courts shall have original jurisdiction of all civil actions where the matter **in controversy** exceeds the sum or value of $75,000 . . . ." 28 U.S.C. § 1332(a) (emphasis added). As the Fifth Circuit has explained, the amount in controversy is "the value of the right **to be protected** or the extent of the injury **to be prevented**." *Leininger v. Leininger*, 705 F.2d 727, 729

(5th Cir. 1983) (emphasis added); *accord Larabee v. U.S. Bank, N.A.*, No. 4:13-CV-418-A, 2013 WL 4077038, at *1 (N.D. Tex. Aug. 9, 2013); *In re Anderson*, No. 4:13-CV-322-A, 2013 WL 3871104, at *1 (N.D. Tex. July 25, 2013); *Harrison v. XTO Energy, Inc.*, 705 F. Supp. 2d 572, 579 (N.D. Tex. 2010); *Sims v. A T & T Corp.*, No. CIV.A. 3:04-CV-1972-D, 2004 WL 2964983, at *3 (N.D. Tex. Dec. 22, 2004).

Along those lines, "Article III of the Constitution confines federal courts to the decision of 'cases' and 'controversies.'" *Shields v. Norton*, 289 F.3d 832, 834–35 (5th Cir. 2002); *see also SEC v. Med. Comm. for Human Rights*, 404 U.S. 403, 407 (1972). "[A]n actual controversy exists where 'a substantial controversy of sufficient immediacy and reality exists between parties having adverse legal interests.'" *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000) (quoting *Middle S. Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986)).

There is no controversy here concerning the sales records that Momar has already provided; this is not an action to protect or enforce the turning over of the documents that Momar has already turned over, *i.e.,* the amount used to claim $341,406.85 "in controversy." Obviously, NCH's Application does not seek to obtain documents that it already received. It is of no matter that the documents Momar already provided NCH are responsive to the Subpoenas. There is no controversy or dispute involving Momar's refusing to comply with the Subpoenas in turning over those documents, given that Momar already provided them to NCH in good faith. Moreover, Momar is not attempting to claw those documents back, and consequently, it cannot be said that this action is NCH's attempt to protect its possession of documents already provided.

At bottom, then, the "$341,406.85" figure used to justify the amount in controversy is simply not in controversy. Under Fifth Circuit precedent, the only sales documents that can provide the amount in controversy necessary to confer subject matter jurisdiction in this case are

invoices evidencing sales that Momar made (through Mr. Phillips) to NCH customers *after* the Injunction issued, given that pre-injunction sales have already been produced. Those are the actual documents "in controversy" based on the Subpoenas. There has simply been no demonstration that the value of such documents exceeds $75,000.

C. <u>NCH Fails to Establish the Amount in Controversy Required for Subject Matter Jurisdiction</u>

NCH's conclusory attempt to satisfy the amount in controversy requirement is unsuccessful.

> [T]he party invoking federal jurisdiction must prove by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount. The district court must first examine the complaint to determine whether it is 'facially apparent' that the claims exceed the jurisdictional amount. If it is not apparent, the court may rely on "summary judgment-type" evidence to ascertain the amount in controversy.

*St. Paul Reinsurance Co. v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir. 1998). Assuming for the sake of argument that NCH properly initiated this proceeding with its filing, it is not facially apparent from NCH's Application that the claims exceed the requisite jurisdictional amount.

NCH asserts, without citations to any record, evidence, affidavits, or other methods commonly invoked to prove mere assertions, that the amount in controversy is satisfied. A breakdown of NCH's unsupported allegations reveals NCH's mischaracterizations in an attempt to meet the monetary threshold:

- "The value of information and testimony sought by the subpoenas is in excess of $75,000 for the purposes of diversity jurisdiction." (Doc. 1 at 13).

NCH has provided no record or evidentiary cite to support this purely conclusory and speculative allegation.

- "Momar's sales to NCH's customers through Mr. Phillips between April 8, 2021 and September 16, 2021 were approximately $341,406.85." (Doc. 1 at 13).

NCH provides no record or evidentiary cite to support this allegation. Accepting for the sake of argument that NCH accurately states this amount—without any actual evidence to corroborate it—it is important to note the sleight of hand NCH uses on this point. The documents Momar provided previously (aggregating to $341,406.85) did relate to the Arbitration and NCH's claim because they reflected sales made "through Mr. Phillips." But, as noted, those documents have already been voluntarily produced and are not in controversy for purposes of the current action. NCH's next leap changes the entire analysis:

- "Additionally, *on information and belief*, the sales to NCH customers after the date of the Temporary Injunction would also exceed $75,000." (Doc. 1 at 13 (emphasis added)).

Again, NCH provides no record or evidentiary cite to support this purely conclusory and speculative allegation. But the greater issue is that NCH removes the qualifying "Momar's sales to NCH's customers **through Mr. Phillips**" from its amount in controversy analysis. Whether Momar sold to NCH customers without Mr. Phillips's involvement has no bearing on NCH's underlying arbitration action against Mr. Phillips. The Arbitration is not against Momar, Momar is not subject to an injunction prohibiting sales to NCH customers, and the documents related to sales Momar made to customers not involving Mr. Phillips have no value for the purpose of determining the amount in controversy. NCH has not provided a shred of evidence establishing that Momar is in possession of documents evidencing post-injunction sales to NCH customers *through Mr. Phillips* in an amount exceeding $1.00—much less $75,000—other than NCH's own representations that it is so. Knowing it cannot satisfy this requirement, NCH subtly removed "Mr. Phillips" from the analysis and simply seeks *all documents* evidencing sales from non-party

Momar to any NCH customers—i.e., documents unrelated to any active litigation or proceeding. At a bare minimum, NCH should be required to put forth concrete evidence demonstrating that it can exceed the amount in controversy by a preponderance of the evidence. This is especially true in the face of Mr. Phillips's deposition testimony—which is actual evidence that NCH cannot satisfy the amount in controversy requirement in this action.

Even accepting for the sake of argument that Momar has made post-injunction sales to NCH's customers, those sales have no value for the purpose of determining the amount in controversy in this proceeding, absent Mr. Phillips's involvement in those sales. NCH currently has no active claims against Momar. Therefore, the only way to satisfy the amount in controversy here is for NCH to demonstrate that *Mr. Phillips* violated the Injunction in making sales to NCH customers, which would result in a potential increase in value to NCH in its claims against Mr. Phillips. But sales that Momar separately made—if any—to customers who happened to be NCH customers, with no involvement of Mr. Phillips, provide no value in the underlying controversy, because NCH is not presently pursuing claims against Momar, Momar is not subject to any injunctions prohibiting sales to NCH customers, and Momar is not restricted from making sales to NCH customers without Mr. Phillips's involvement.

Taking the foregoing one step further, even assuming Ms. Ray made sales to NCH customers—and NCH has presented no evidence supporting this allegation—without Mr. Phillips's knowledge, intent, direction, or involvement, Ms. Ray's conduct is not imputable to Mr. Phillips and the claims against him in the Arbitration. The only potential misconduct there is attributable to Momar, but again, NCH is not pursuing claims against Momar. In any event, NCH has no evidence that Mr. Phillips directed, conspired, planned, or otherwise communicated with

Ms. Ray that she should continue to make sales to NCH customers during Mr. Phillips's injunction—and Mr. Phillips's deposition testimony shows the exact opposite.

The foregoing demonstrates the fatal flaws with NCH's subpoena expedition. Rather than propounding evidence that Mr. Phillips improperly participated in sales in violation of the injunction and then requesting documents and testimony targeted to those sales, NCH pursues the opposite course: a blind exploration. It wants all sales records from Momar to NCH customers, regardless of whether Mr. Phillips had knowledge of, intended, directed, or had any involvement with the sales whatsoever, in an attempt to (1) comb through those documents and see if it can maybe find something to pin on Mr. Phillips through Momar or (2) obtain impermissible pre-hearing discovery from Momar without first alleging any right to relief against Momar. This fishing expedition should not be permitted.

## CONCLUSION

For the foregoing reasons, Momar respectfully requests that the Court affirm the Magistrate Judge's ruling denying NCH's Application. To the extent it would assist the Court, Momar respectfully requests a hearing on this matter and has filed a request for hearing contemporaneously herewith.

Respectfully submitted this the 2nd of September, 2022.

*/s/ Benjamin T. Pendroff*
Benjamin T. Pendroff
State Bar No. 24094893
bpendroff@btlaw.com
BARNES & THORNBURG LLP
2121 N. Pearl St., Suite 700
Dallas, Texas 75201
Tel.: (214) 258-4200
Fax: (214) 258-4199

***Attorney for Defendant Momar, Inc.***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on September 2, 2022, the foregoing document was filed electronically in compliance with the Federal Rules of Civil Procedure and all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ Benjamin T. Pendroff*
Benjamin T. Pendroff